

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DAWN A TOTARUM
    Vs.                                       C.A. No.     2013 CA 007616 B
SODEXO

# INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge LAURA A CORDERO
Date:  November 12, 2013
Initial Conference: 9:30 am, Friday, February 14, 2014
Location:  Courtroom A-50
          515 5th Street N.W.
          WASHINGTON, DC  20001                        Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Telephone: (202) 879-1133**

_Dawn A. Tolaren_
_____
Plaintiff

vs.

**13 - 0 0 0 7 6 1 6**
Case Number _____

_Sodexo_
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_Yaida Soud_
_____
Name of Plaintiff's Attorney

_601 Pennsylvania Ave NW_
_____
Address
_Ste 900   Wash DC 20004_

_202-200-3035_
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date ___11/12/2013___

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ።

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011

CASUM.doc



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA,
DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                    Demandante

        contra

                                    Número de Caso: _____

_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                    Por: _____
_____              Subsecretario
Dirección

                                    Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화하십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea converser con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-682-2700) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

                    Vea al dorso el original en inglés
                    See reverse side for English original

                                                            **CASUM.doc**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

DAWN A. TOTARAM     )
c/o THE FORD LAW FIRM PLLC  )
601 Pennsylvania Ave, NW Ste. 900 )
Washington, D.C. 20004    )
            )
 Plaintiff,        )
            )
  v.          ) Case No. _____
            )
            )
SODEXO        )
 c/o Corporate Creations Network  )
 1629 K Street, NW Ste. 300   )
 Washington, D.C. 20006    )
            )
            )
 Defendant.       )

**FILED**
CIV     CH
NOV 1 2 2013
District ... ..bia
Washington, D.C.

**13 - 0 0 0 7 6 1 6**

## COMPLAINT FOR DISCRIMINATION AND RETALIATION

Comes now the Plaintiff, Dawn Totaram, and through undersigned counsel, states as
follows:

## PARTIES

1. Plaintiff, Dawn Totaram, (referred to as "Ms. Totaram") resides at 2900 Leka Drive
Huntingtown, MD 20639.   She is of Guyanese ancestry and born of hard-working
immigrant parents. Her mother is Indian and her father is from Barbados but was raised in
Guyana.  Ms. Totaram, by appearance, looks like an African-American with a medium
complexion.  However, she has a prominent accent that is characteristic of people from
Guyana and she is very soft-spoken.

1

2. For almost 30 years, Ms. Totaram worked faithfully for Defendant at various locations, some of which were 150 miles from her home (round trip).

3. Her most recent position was in the District of Columbia as a general manager at the International Monetary Fund ("IMF") where she worked for approximately three years.

4. Ms. Totaram was fired under the pretense of a lay-off notice issued to her on April 22, 2013.

5. Defendant Sodexo (referred to interchangeably as "Sodexo" and "Defendant") is a multinational corporation that maintains its United States headquarters at 9801 Washingtonian Boulevard, Gaithersburg, MD 20878.

6. Defendant, by and through its managers, retaliated against Ms. Totaram after she did what HR told her to do—report Carla Held's conduct to HR representative Tony Woods.  HR even told Ms. Totaram *in writing* that if she discussed the allegations against Ms. Held with anyone that she could be sued.

7. Ms. Held is a Sodexo employee and General Manager to whom Ms. Totaram reported at IMF.  Sue Traskos, is a district manager and the direct supervisor for both Ms. Held and Ms. Totaram.

8. Ms. Held persistently and publicly harassed, bullied, and humiliated Ms. Totaram for various reasons, including her speech and accent, which arise from her national origin and nerve damage from a cancer surgery she had in 2010.  Other Sodexo employees witnessed Ms. Held's conduct, including Tony Woods.  However, Ms. Held was documented only after Ms. Totaram complained and was then fired in retaliation.

2

## BACKGROUND

9. Defendant has an employee handbook that lays out an extensive anti-discrimination and anti-harassment policy.

10. Page 16 of Defendant's handbook states in pertinent part:

"It is against company policy for any employee to be ridiculed, belittled or embarrassed by jokes, slurs and comments; subjected to intimidating, abusive or offensive comments... Any employee who in any way discriminates against or harasses a fellow employee...may be subject to immediate termination of employment. Sodexo <u>will not retaliate</u> against an individual because he or she opposes any unlawful practice, files or participates in an investigation of an internal claim or a formal charge of discrimination...." Emphasis added.

11. Despite such a clear mandate against discrimination, harassment and retaliation, Defendant Sodexo, by and through its managers, Sue Traskos and Carla Held, fired Ms. Totaram after she verbally complained on April 9, 2013 to HR Director Tony Woods about the abusive, harassing, and discriminatory conduct she had endured at the hands of General Manager Carla Held.

12. The conduct Ms. Totaram reported included incidents where Ms. Held scoffed and laughed at Ms. Totaram in front of IMF staff and Ms. Totaram's staff and peers because of her accent, which was exacerbated by cancer treatments that damaged the nerve endings in her lips. On one occasion, Ms. Held told one of Ms. Totaram's employees to have Ms. Totaram say certain words where her accent would be more pronounced. Ms. Held did this with the intent to humiliate Ms. Totaram in front of her subordinates.

13. Although Ms. Held's conduct was and is a basis for termination under Sodexo's policies, Ms. Totaram was the one Sodexo fired.

14. By firing Ms. Totaram after she complained about Ms. Held's conduct, Sodexo violated its own policies.

3

15. On July 31, 2013, approximately two weeks before Ms. Totaram's 30-year anniversary with the company, she sent Sodexo CEO Michel Landel a letter requesting his assistance in rectifying her termination.

16. On August 21, 2013, Sodexo sent a letter to the undersigned in response to Ms. Totaram's July 31st letter to Mr. Mandel and a demand letter from counsel, stating that its actions against Ms. Totaram were lawful and nondiscriminatory.

17. After "laying off" Ms. Totaram due to "lack of work," Ms. Totaram was replaced by a much younger Caucasian woman who'd only been with the company for approximately 4 years.

18. Sodexo's tolerance of Ms. Held's discriminatory conduct and its subsequent retaliatory discharge of Ms. Totaram, is a violation of Title VII and the DC Human Rights Act.

19. Sodexo's threat against Ms. Totaram that she could be sued if she discussed the allegations against Ms. Held and the response from its CEO suggests that the company is more concerned about covering up discrimination than rectifying it and that it does not honor its own policies even at the highest levels of management.

## JURISDICTION AND VENUE

20. This Court has concurrent jurisdiction over Title VII claims involving race and national origin pursuant to sec. 2000e-5 of the Civil Rights Act, which states that "an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed." 42 U.S.C. § 2000e-5(f)(3).

21. This Court has jurisdiction over the District of Columbia Human Rights Act claims involving age, race and national origin pursuant to D.C. Code § 2-1403.16.

22. This Court has jurisdiction over the age discrimination claim pursuant to the Age Discrimination in Employment Act of 1967 at 29 U.S.C. §626(c)(1), which states that "Any person aggrieved may bring a civil action in any court of competent jurisdiction." See also Carter v. District of Columbia, 980 A.2d 1217 (DC 2009).

23. The District of Columbia is also the proper venue within which to bring the discrimination and retaliation action. See Monteilh v. Afscme, Afl-Cio, 982 A.2d 301 (DC 2009).

24. The decision to terminate Ms. Totaram and the termination itself happened in the District of Columbia.

25. The facts of this case are fully set forth below.

## FACTS

26. Ms. Totaram began working for Sodexo in August 1983.

27. Ms. Totaram's first position was as a cashier. She worked her way through the ranks and became a General Manager in 1999. She worked as a general manager until she was terminated right before celebrating her thirtieth (30th) anniversary with the company, which would have been on August 16, 2013. She was 48 years old.

28. Shortly after Ms. Totaram began working at IMF in 2010, she was diagnosed with a rare form of cancer called Myxofibrosarcoma. The cancer manifested as a tumor on one of her glands which created swelling on the left side of her face.

29. The official diagnosis was made in June 2010. She had surgery on August 12, 2010 but it was only partially successful. The doctor only removed part of the tumor.

30. Ms. Totaram had a second surgery on November 17, 2010. Immediately after this surgery, however, Ms. Totaram's face became infected.

31. She had a third surgery in December. She began radiation treatments in January 2011. Her regimen consisted of 36 treatments for one hour each day.

32. Ms. Totaram worked at IMF from 6:00 a.m. to 3:30 p.m. and then headed straight to her radiation appointments.

33. After her 36 treatments concluded, she had follow-up appointments with her physician every 6 months.

34. While Ms. Totaram was battling cancer, Tim Manson was her district manager until 2012.

35. Carla Held is a general manager and was transferred to IMF in 2011. At IMF she is responsible for a portion of the site called "HQ1."

36. Ms. Totaram oversees "HQ2."

37. Sue Traskos is a district manager and was transferred to IMF in 2012. She replaced Mr. Manson.

38. Due to the size of the IMF, Ms. Totaram reported to Ms. Held and then the district manager, Ms. Traskos.

39. Ms. Held and Ms. Traskos are good friends.

40. Shortly after Ms. Totaram and Ms. Held began working together in 2011, Ms. Held began to intimidate and harass Ms. Totaram at work, often making disparaging remarks about her accent and cancerous condition. Ms. Held's conduct was occasionally vulgar as she used profanity and other offensive verbal and body language.

41. Ms. Held's conduct created a hostile work environment for Ms. Totaram. Ms. Traskos, who supervises Ms. Totaram and Ms. Held, often witnessed Ms. Held's behavior and always justified it. Other Sodexo employees also witnessed Ms. Held's conduct.

42. For example, during managers' meetings, Ms. Held would physically put her hand in Ms. Totaram's face to hush her whenever she attempted to speak.

43. Ms. Held made demeaning remarks about Ms. Totaram's cancer. On occasion Ms. Totaram would forget to do something on her task list and Ms. Held would remark, "that radiation has affected your brain."

44. One day a food delivery that was intended for Ms. Held's station (HQ1) was mistakenly delivered to Ms. Totaram's station (HQ2). Thinking the delivery was there for their use, one of Ms. Totaram's employees put the item away. In response, Ms. Held yelled at Ms. Totaram, "You will f***ing pay for it! Tell your people to check the label before they f***ing use my s***!" There was one occasion where a delivery (cups and soda) Ms. Totaram was expecting went to HQ1. Customers complained about missing cups and soda. Rather than returning it to HQ2, Ms. Held's staff used the items.

45. During one manager's meeting, Ms. Held asked Ms. Totaram if she had any concerns or questions to raise. When Ms. Totaram raised an issue regarding one of the chefs, Ms. Held, who was sitting across from Ms. Totaram, leaned over the table and angrily told her to be quiet.

46. Ms. Held often denied Ms. Totaram's requests to take leave for necessary medical or family related appointments. For example, when Ms. Totaram requested a day off to move her son into his dorm for his freshman year at college, Ms. Held told her to let him go by himself

47. Ms. Held repeatedly humiliated Ms. Totaram because her accent in front of her staff. On one particular day, Ms. Held asked Ms. Totaram's co-workers to ask Ms. Totaram to say the word "SANDWICH" and "SUPPOSED." One of Ms. Totaram's employees actually did it and Ms. Held laughed hysterically in Ms. Totaram's face while Ms. Totaram sat aghast and humiliated.

48. Ms. Traskos, despite being the direct supervisor for both Ms. Totaram and Ms. Held, actually joined Ms. Held in humiliating Ms. Totaram during a client meeting where IMF employee, Heather Leanna, was present.

49. During this meeting, everyone went around the room to introduce themselves and say the company for which they worked. Ms. Totaram gave her name and then said "SODEXO" with a very pronounced accent. Ms. Held abruptly burst out laughing. Ms. Traskos, going along with Ms. Held, turned to Ms. Totaram and asked her, "Is this why you don't want to do training anymore?" Ms. Traskos was referring to a safety training that Ms. Totaram used to do with employees prior to having three cancer surgeries.

50. The next day, during a manager's meeting, Ms. Held rehashed the incident from the client meeting; she described how Ms. Traskos humiliated Ms. Totaram in front of the client.

51. Other staff members, many of whom witnessed these incidents, told Ms. Totaram to file a complaint against Ms. Held.

52. Sodexo's handbook explicitly proscribes "jokes" and "offensive comments" that make an employee feel "embarrassed" or "ridiculed." It goes on to state that any employee who perpetuates such behavior could be subject to "immediate termination."

53. The aforementioned are a few of many incidents that led to Ms. Totaram interviewing for another position within the company on July 13, 2012.[1]   Ms. Totaram informed Ms. Traskos about why she wanted to transfer to another location in 2012.   Instead of addressing Ms. Totaram's concerns, however, Ms. Traskos defended Ms. Held's hostile and discriminatory actions, stating that Ms. Held had been with Sodexo for many years and had to "fight her way through" a male-dominated environment.[2]

54. Ms. Traskos on various occasions told Ms. Totaram to "stand up" to Ms. Held.

55. Ms. Totaram feared for her job, so she never confronted her.  Unfortunately, Ms. Totaram's fear became reality.

56. On March 28, 2013[3] Ms. Totaram received a Performance Action Plan ("PAP") from Ms. Traskos.  Ms. Held was copied on the PAP.

57. Present at the meeting regarding Ms. Totaram's PAP were Ms. Totaram, Ms. Traskos and Ms. Held.

58. Ms. Totaram was shocked and upset at the false and seemingly minor accusations on the PAP, including a claim that she did not relocate a fountain machine fast enough and did not create an alternative source of hot water after the dispensers ran out of water.

59. Ms. Totaram's previous supervisors never placed her on a PAP, formally reprimanded, or negatively evaluated in her 29-year career with Defendant, to her knowledge.

---

[1] Other incidents were documented and reported to HR.

[2] Both Ms. Totaram and Ms. Held have worked for Defendant for close to the same number of years and both are women. Ms. Held's conduct was and is not justifiable for the reasons Ms. Traskos mentioned.

[3] The PAP was dated March 27, 2013 but Ms. Totaram received it for the first time during a meeting with Ms. Traskos and Ms. Held on March 28, 2013.

60. Less than one month later she was "laid off."

61. While Sodexo contended in a letter dated August 21, 2013 that Ms. Totaram's previous supervisor (whom it does not name) documented Ms. Totaram and IMF made specific complaints about her, it did not terminate her for performance-related reasons.

62. Instead, the lay-off notice came within weeks (April 22, 2013) of her verbal complaint to HR representative Tony Woods on April 9, 2013.

63. Moreover, Ms. Totaram's previous supervisor of 5-6 years, Tim Manson, does not recall ever negatively evaluating Ms. Totaram's performance or documenting her and he gave Ms. Totaram a letter of reference. This completely contradicts Sodexo's statement that her "previous" supervisor documented her for her performance.

64. Mr. Manson recalls a time in 2011 when Ms. Totaram's and Ms. Held's unit failed an audit. Notably, Ms. Totaram was fighting cancer at this time and both managers were responsible for making sure customer needs were met at IMF and both managers signed off on a document regarding the audit.

65. Ms. Leanna, the IMF representative, recalls customers complaining about service levels but told Sodexo management in an email that Ms. Totaram was responsive to necessary changes and customer suggestions.

66. Sodexo management was desperate to find deficiencies in Ms. Totaram's performance to create a record that would justify firing her.

67. When this could not be accomplished, Ms. Trasksos and Ms. Held created a negative performance evaluation and action plan (PAP) based on false accusations.

68. During the PAP meeting Ms. Totaram wept because she knew that both Ms. Traskos and Ms. Held were trying to get her fired.

69. In the meeting, Ms. Totaram told both women that she'd never been treated this way by her fellow Sodexo employees.

70. In that moment, Ms. Traskos turned to Ms. Held and told her that they needed to "fix this" before renovations were completed.[4]

71. Ms. Traskos wrote in the PAP that they would have a "progress meeting" over the next 60 days.

72. This meeting never happened because Ms. Totaram was fired on April 22, 2013 (less than 30 days later) under the pretext of a reduction in force (RIF).

73. Righter after she received the PAP Ms. Totaram experienced another confrontation with Ms. Held that finally pushed Ms. Totaram to the point where she complained to HR.

74. On April 3, 2013, Ms. Totaram had a doctor's appointment scheduled for a post-radiation cancer check-up.[5]  Ms. Totaram's doctor notified her 24 hours in advance because a slot had opened up at the last minute. Ms. Totaram had been trying to see the doctor but he rotates shifts at various locations once per month.  He was scheduled to come in on April 3, 2013.  If Ms. Totaram missed this appointment, she would not have been able to see him again until the following month.

---

[4] Sodexo was undergoing renovations and restructuring during this time.  Very few employees' positions were cut as a result and no managerial positions were cut, except Ms. Totaram's position.
[5] Ms. Totaram is in remission.

75. On April 2, 2013, Ms. Totaram emailed Ms. Held to advise her that she would not be working in the afternoon because she had a doctor's appointment.

76. During a managers meeting on April 3, 2013, Ms. Totaram reminded Ms. Held that she had to leave early for her appointment. Ms. Held abruptly jumped up from her chair, stood over the table where the three women were meeting, threw her hands in the air and snatched her papers off of the table and angrily yelled at Ms. Traskos, "You handle it!" and stormed out of the meeting.

77. Ms. Traskos looked at Ms. Totaram and said that she should have informed Ms. Held sooner--"before she got all worked up." Ms. Totaram stayed longer and missed her actual appointment time.

78. This incident was compounded by the PAP that she received a week earlier.

79. For fear of losing her job, Ms. Totaram left Tony Woods, HR Director, a voicemail on April 3, 2013.

80. Ms. Totaram left Mr. Woods another message on April 8, 2013.

81. Mr. Woods returned Ms. Totaram's call on April 9, 2013. She explained that her job was on the line. She confided that she felt targeted because she is a foreigner.

82. Mr. Woods advised her to file a written complaint against Ms. Held in accordance with Sodexo policies.

83. That same day, April 9, 2013, Ms. Totaram sent a written response to the PAP, refuting each of the allegations.

84. Ms. Totaram began writing the complaint but did not file it with HR at that time because she feared being retaliated against. She knew Ms. Traskos and Ms. Held were friends, and observed Ms. Traskos' lack of supervision, tact, and conflict resolution when addressing Ms. Held's behavior.

85. Just two weeks after she contacted Mr. Woods and refuted the PAP, she received a layoff letter on April 22, 2013.

86. Ms. Totaram then submitted the written complaint to HR on April 23, 2013.

87. Shortly after issuing the lay-off notice to Ms. Totaram, Sodexo posted a new position at IMF called Food Services Manager.

88. Ms. Totaram did not post for the position because she was advised by Jim Burke, Vice President of Operations at Sodexo, that Sodexo had a contract with Venable and that he would send her there to work. Mr. Burke was aware of the complaints about Carla's conduct.

89. Mr. Burke also told Ms. Leanna, the IMF liaison for Sodexo, that he had another job lined up for Ms. Totaram.

90. However, Ms. Totaram was never sent to Venable as Mr. Burke promised. Instead, another manager was sent to that post. Ms. Totaram was lied to about her future with Sodexo.

91. To cover up their retaliatory actions, Sodexo had a recruiter call Ms. Totaram to ask her to post for the Food Services Manager position. When she attempted to apply, she noticed that her name had already been submitted as a candidate. The recruiter corrected the problem and Ms. Totaram applied for the Food Services Manager position.

92. The only other person to apply for the position was Sodexo employee, Megan Lepovetsky.

93. Ms. Lepovetsky moved into Ms. Totaram's old office on April 28, 2013, before Ms. Totaram interviewed for the position.

94. Ms. Totaram was told that she would be sharing space with Ms. Lepovetsky until renovations were completed.

95. However, Sodexo was preparing Ms. Lepovetsky for the position. She was also given a company laptop before Ms. Totaram interviewed for the position. At least two Sodexo employees had been informed that Ms. Lepovetsky was getting the job before Ms. Totaram interviewed.

96. Ms. Totaram interviewed for the job on May 8, 2013.

97. On May 28, 2013, Ms. Totaram was informed that she did not get the job.

98. Ms. Lepovetsky is approximately 13–14 years younger than Ms. Totaram, white, and has only been with the company for approximately four (4) years. She received the position.

99. While the letter purports that there was a reduction in force due to "lack of work," Ms. Totaram was the only general manager at IMF to receive a layoff notice from Sodexo.

100.    There were two general manager positions[6] prior to her layoff and there are two positions now.

101.    Both general manager positions are held by white employees.

---

[6] The positions may have been re-titled.

102.     On June 6, 2013, more than one month after her termination, Ms. Totaram received a response from Sodexo regarding her written complaint against Ms. Held.  The letter, signed by HR Director Mr. Woods, states that he "confirm[ed]" that Ms. Held engaged in some of the improper conduct that Ms. Totaram alleged in her complaint.

103.     The letter further stated that Ms. Held would be documented, but went on to state that if Ms. Totaram disclosed this information to anyone, then such disclosure could result in a legal claim by Ms. Held against Ms. Totaram.

104.     This letter was Sodexo's attempt to further intimidate Ms. Totaram and cover the discriminatory conduct of its managers by preventing Ms. Totaram from pursuing legal action against the company.

105.     Shortly after giving Ms. Totaram the "layoff" notice, Ms. Traskos sporadically assigned her to various locations to work, some of which were 75 miles, each way, from Ms. Totaram's home.

106.     She was never re-assigned to another contract as Mr. Burke represented to both her and IMF employee Ms. Leanna.

107.     Ms. Traskos inconsistently assigned Ms. Totaram work thereby requiring her to use her personal leave for days or weeks until she received another assignment.

108.     On July 31, 2013, two weeks before her 30th anniversary with Sodexo, Ms. Totaram sent a letter to CEO Michel Landel via email asking for his assistance to rectify her circumstances.

109.      On August 24, 2013, Ms. Totaram, through counsel, received a response from Defendant and its CEO that its actions were lawful and nondiscriminatory.

110.      On October 30, 2013, Ms. Totaram received a second lay-off notice. Sodexo gave Ms. Totaram a few temporary assignments after she complained to HR to cover up the abruptness of her termination. However, there were permanent positions available for which Ms. Totaram was qualified.

## COUNT I: RETALIATION

111.      Ms. Totaram incorporates herein by reference the allegations in paragraphs 1 through 82.

112.      Title VII of the Civil Rights Act (42 U.S.C. § 2000e(2)) states that "It shall be an unlawful employment practice for an employer -

> (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e(2) (2012).

113.      The D.C. Human Rights Act, has a provision that mirrors the aforementioned Title VII provision. This DCHRA provision states that "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter." D.C. Code Ann. § 2-1402.61 (2013).

114.    Ms. Totaram's accent is the direct result of her national origin. She is from Guyana. It was her accent, among other things, that Ms. Held and Ms. Traskos repeatedly mocked, subjecting her to ridicule and humiliation in front of other employees.

115.    When Ms. Totaram reported Ms. Held's conduct Ms. Totaram was fired in retaliation under the pretext of a "lay-off" due to a purported reduction in force.

116.    No other Sodexo general managers at IMF were laid off.

117.    Ms. Totaram's firing was an adverse action that was discriminatory and retaliatory in violation of both Title VII and DCHRA.

WHERFORE, the Ms. Totaram prays for the following relief:

118.    Back pay of her annual salary of $72,000.00, plus a cost-of-living adjustment;

119.    $1,080,000.00 in damages (equivalent to the gross amount of her salary if she worked until retirement age);

120.    Punitive damages;

121.    Attorney's fees and costs;

122.    The maximum statutory civil penalty of $10,000 under the DCHRA.

## COUNT II: DISCRIMINATION

123.    Ms. Totaram incorporates herein by reference the allegations in paragraphs 1 through 82.

124.    Title VII of the Civil Rights Act (42 U.S.C. § 2000e(2)) states that "It shall be . . . unlawful . . . for an employer—

(1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e(2)(a)(1) (2012).

125.     The D.C. Human Rights Act states that "It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, . . . [or] disability . . . of any individual:

(1) By an employer - To fail or refuse to hire, or to discharge, any individual; or

otherwise to discriminate against any individual, with respect to his compensation,

terms, conditions, or privileges of employment."

126.     After putting Ms. Totaram on a PAP with a 60-day progress meeting scheduled, Defendant gave her a "lay-off" notice less than 30 days after the March 28, 2013 PAP meeting.

127.     Jim Burke told Ms. Totaram and IMF employee, Heather Leanna that Ms. Totaram would be re-assigned on a permanent basis.  This was false.

128.     A Sodexo recruiter instructed Ms. Totaram to apply for the Food Services Manager position, which paid the same pay as Ms. Totaram received as general manager.

129.     Despite her almost 30 years of experience with the company, Ms. Totaram was passed over for the position.

130.     Instead, Defendant hired a much younger Caucasian woman who'd been with Sodexo for only 4 years.

131.    While the Defendant claims Ms. Totaram's position was "cut" due to lack of work, the evidence in this case shows the exact opposite. No other manager's positions were cut. Ms. Totaram was simply replaced with a younger, less experienced white employee.

132.    Defendant's refusing to hire Ms. Totaram for the position after asking her to apply and passing her over for the job only to hire a less-experienced Caucasian employee was based national origin and race discrimination. This violates both Title VII and the DCHRA.

WHEREFORE, the Ms. Totaram prays for the following relief:

133.    Back pay at her annual salary of $72,000, including cost-of-living adjustment.

134.    $1,080,000.00 in damages (equivalent to the gross amount of her salary if she worked until retirement age of 62).

135.    Punitive damages.

136.    Reasonable attorney's fees and court costs.

137.    The maximum statutory civil penalty of $10,000 under the DCHRA.

## COUNT III: AGE DISCRIMINATION[7]

138.    Ms. Totaram incorporates herein by reference paragraphs 1 through 104.

139.    The Age Discrimination in Employment Act states that "It shall be unlawful for an employer-

---

[7] We must file an EEOC claim for age discrimination 60 days before filing a civil complaint for age discrimination per 29 U.S.C. § 626(d)(1).

(1) . . . to discharge any individual or otherwise discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age." 29 U.S.C. § 623(a) (2012).

140.    The D.C. Human Rights Act states that "It shall be an unlawful discriminatory

practice to do any of the following acts, wholly or partially for a discriminatory reason

based upon the actual or perceived: ...age . . . of any individual:

(1) By an employer - To fail or refuse to hire, or to discharge, any individual; or

otherwise to discriminate against any individual, with respect to his compensation,

terms, conditions, or privileges of employment"

141.    Defendant discharged Ms. Totaram under the pre-text of a lay-off, then told her that

she would be re-assigned to another location and then instructed her to apply for the "new"

Food Services Manager position (which was ostensibly the same position she had with the

same pay).

142.    Despite Ms. Totaram's nearly 30 years of experience with Sodexo, she was passed

over for the position.

143.    Instead, Defendant hired Ms. Lepovetsky who is approximately 14 years younger

than Ms. Totaram and with only four years of experience.

144.    Defendant's adverse action resulted in Ms. Totaram's permanent discharge and was

motivated by her age. This violates DCHRA and the Age Discrimination in Employment

Act.

WHERFORE, the Ms. Totaram prays for the following relief:

20

145.     Front pay in the amount $1,080,000.00 which is the equivalent to 15 years of Ms.

Totaram's salary had she continued working until retirement age of 62.

146.     Punitive damages.

147.     Reasonable attorney's fees and costs of the action.

148.     The maximum statutory civil penalty, if any, under the ADEA.

149.     A jury trial.

150.     All other relief the Court deems equitable.

## COUNT IV: FAILURE TO PAY WAGES UPON DISCHARGE

151.     Ms. Totaram has approximately 12 days of unpaid leave that Defendant has failed

to pay.

152.     Ms. Totaram received a letter from Defendant on October 30, 2013 stating that it

would pay her 35 hours of unused leave.

153.     Ms. Totaram called HR representative Mr. Woods on October 30, 2013 and

November 1, 2013 advising him of the error.

154.     Ms. Traskos called Ms. Totaram on October 31, 2013 telling her that a check for

the 35 hours would be sent to her via Western Union.  Ms. Totaram advised Ms. Traskos

that Sodexo owed her for 96 hours.

155.     To date, Defendant has failed to pay said wages in violation of D.C. Code Section

32-1303, subsections (1) and (4) which state, in pertinent part:

Unless otherwise specified in a collective agreement between an employer and a bona
fide union representing his employees:

(1) Whenever an employer discharges an employee, the employer shall pay the
employee's wages earned not later than the working day following such discharge;
provided, however, that in the instance of an employee who is responsible for monies
belonging to the employer, the employer shall be allowed a period of 4 days from the

date of discharge or resignation for the determination of the accuracy of the employee's accounts, at the end of which time all wages earned by the employee shall be paid.

(4) If an employer fails to pay an employee wages earned as required under paragraphs (1), (2), and (3) of this section, such employer shall pay, or be <u>additionally liable to, the employee</u>, as liquidated damages, 10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to the unpaid wages, whichever is smaller;

156.    Ms. Totaram has not been paid despite raising the issue with the Defendant.

WHERFORE, the Ms. Totaram prays for the following relief:

157.    Liquidated damages pursuant D.C. Code Section 32-1303(4).

158.    All unpaid wages due.

Respectfully Submitted,

Yaida O. Ford
Bar # 497013
Ford Law Firm, PLLC
Attorney for the Ms. Totaram
601 Pennsylvania Avenue, Suite 900
Washington, D.C. 20004